The next case today is 221982 United States v. Anthony Rivera-Rivera, 231112 United States v. Victor Hernandez Carrasquillo, 231133 United States v. Jimmy Rios-Alvarez. Will attorney for Rios-Alvarez please come up to the podium and introduce yourself on the record? Good morning. May I please step forward? My name is Lidia Liza-River and I am counsel for appellant Jimmy Rios-Alvarez. In this case we have raised the issue, your honors, that there is no evidence of intent on the part of Jimmy Rios-Alvarez to commit a carjacking pursuant to 2119, the federal carjacking statute. It might be something else, but it doesn't comply with the elements of the federal carjacking statute. And we say that for the following reasons. In this case there were witnesses who testify as to what happened. There was Mr. Wilmer Suarez. Wilmer Suarez testified that he was the one who planned to rob the house because they wanted money. Having done that, he then gathered people to go with him and according to him, the only thing that they agreed upon was to rob money. Can I ask you a specific question? Yes. So in your brief you cite Rosario Diaz, which is where there was insufficient evidence that the appellant had aided and abetted a carjacking, do you remember that? But in that specific case, the appellant had ordered a robbery but were not themselves on the scene when it turned into a carjacking. So I'm wondering if that distinguishes Rosario Diaz from the case here, specifically where your client was on the scene and where we have statements about his knowledge. Certainly, my client was there. There's no issue with that. And he was armed. He had a gun. That was true. We do have a statement too that he saw two of his co-defendants leave with the car, right? Yes, Your Honor. Okay. Now, what were his acts or words to show that he had the intent either to commit a carjacking or to aid and abet when it was done? Let's be very precise about that. What time frame, when temporally, do you think he had to form that intent? Before they went to the house? Is that your argument? No, Judge. All right. So what time, when does he have to form that intent? Very precise. We know, Your Honors, that those men were in that house for about three and a half hours. Okay? And things happened during that time. They found no money, and at that time, it is that they decide, or Wilmer Suarez decides, that he is going to get the money from the ATM. Now, Wilmer Suarez testified, I decided to take the vehicle and I didn't. When that happened, Your Honor, my client was not there with him or even around. So the one, that moment, that time, I don't know, but that was at the very end of what happened that day during three and a half hours. Wilmer Suarez goes downstairs, taking Luis, a victim, puts him in the car and then brings him out, and he decides to go, when I say he, it's Suarez, with Guzman to the ATM machines. My client was not there at that time. He was not asked, he was not told, he didn't have any knowledge that that was going to  Suarez gets in the car and leaves. My client sees them leave. He said that to the agents at one point in time, that he saw them when they left in the car. That is not enough, Your Honor, to join either a carjacking venture or aiding someone. So what's your view of the abduction rule, which I believe, as I understand, we have not abandoned, which says that if you continue to keep these people hostage, knowing that their car has been taken, you are participating in the carjacking because the taking of the car is ongoing. Okay. Your Honor, as to that point, specifically, my client was not even upstairs. He was downstairs. But you just told me he knew they took him in the car. He told the agents that he saw the car leave. Yes, he did that. He said that after the whole thing happened. And he didn't think Luis drove off by himself, did he, right? I'm sorry? He didn't think the victim drove off by himself in the car, given what had happened. So the bad guys have left in the car, right? The other co-defendants have left in the car. He's still in the house. He sees the car go, and he has two other people, the mother and the brother, in the house. And he continues to be keeping them, watching over them, right? With a gun. No, Your Honor. There is no fact in that trial that says that at that time, he had a gun with him. We know that he went to the house, and all of them had guns except Suarez. But at that time, when they decide to go to the HMSU- He stays in the house with the- he doesn't leave, right? He stays with the mother and the brother, right? Right. Okay. And he knows his confederates took the car. He saw the car. It's quite different, I think, Your Honor, from knowing, because he was told that was going to happen, than from seeing an action by another. But then the question is, if he sees them take the car, and then he continues to stay there and guard over the people whose car it is, I think we still say that's part of the carjacking. And at that point, when you continue to do that, you are aiding and abetting that carjacking. I would say no. My client, Your Honor, left the house. When Suarez turns around to go back to the house, my client is not even there anymore. He sees my client- Suarez sees my client driving, going out of the house. So he didn't stay with Carmen and Antonio. He left the house. So he wasn't really guarding them, Your Honor. He left. And there's no- He was with them when the car was taken, though. I'm sorry? He was with them when the car was taken. No, he was not. He was- Suarez goes downstairs with Guzman. My client is upstairs. They go- My client goes downstairs, and the next thing that we know is that Suarez is turning back. My client left the house. My client didn't stay there to wait for anyone. He left the house. He was driving the Lancer at that point in time, getting out, going away. And I do understand that for a carjacking, Your Honor, there has to be the force, the violence, intimidation. At the moment that the car is taken, Doña Carmen and her son didn't even know that the car had been taken. They knew the car was taken when they go downstairs to be able to get help from the doctors, from the medical. Thank you. Your time is up. Thank you. Attorney for Hernandez Carrasiv, please come up and introduce yourself on the record. Good morning. My name is Miguel Oppenheimer. I'm the attorney for Victor Hernandez Carrasiv. If I can please- The appellants can please reserve one minute for rebuttal. You would like one minute. Is that right? Yes. Okay. Thank you, ma'am. So before I start, Judge Efraim, I'd like to take a swing at your question very quickly. And our position is the following. When the car left the home, the other five defendants who stayed in the house, they were guarding the victims for the sole purpose of continuing the robbery.  Because the car was being driven to an ATM to get money out of two ATM cards. But the ATM numbers, they called from the gas station and the people, the defendants that were there were making sure the ATM numbers were provided and were correct. When the money is taken out of the ATM, they drive back to the home. And as the witness Suarez, who is the organizer, said, we went back to the house to check if the guys had already left. So once that transaction was done, once the robbery was completed, once they had the money, they simply left the home. They did not stay guarding anyone. Even though the carjacking, if it was a carjacking, was still continuing- I mean, you can do carjacking and robbery simultaneously. Yes, ma'am. But as to my- You can do a short-term carjacking, too. You could do a carjacking because you need the car, you steal the car, you use the car, you bring the car back. But while you're taking the car, you don't want the victims calling the police to interfere with what you're doing. So you guard the people in the house who could call the police. Isn't that part of the short-term carjacking that happens? It is. But the carjacking continued, Judge, even though after, when they finished getting the money from the ATM, they continued with the car, and they drove the car to a public housing project. So they continued with the car. The victims were in the house up until- What does that mean? That means the carjacking continued. I don't understand what significance that driving to the public housing meant. Because they took the car, they took the car to the ATM, and after the ATM, they just left with the car. They did not return the car to the property. But once the money was obtained from the ATMs, the other defendants left the property, and they left in the car. They arrived in. Okay, so at some moment, they decide, we're done guarding these people. We're going to take off now. We've had the car long enough. Our mission is complete. We're going to drop the car at a housing project. That's the end of it. We're done. Because it can't stay there forever, obviously. But still, for a period of time, they made sure that that car was able to be used by the Confederates so that the victims couldn't call the police, which might have ended the caper. Correct. And at the same time, the purpose of being in that house was a burglary, was a robbery. So they were trying to obtain that exact same point, which was obtaining money. There was a lot of violence when they were there, and there's no doubt as to it. But the violence was also directed towards the information that they wanted to obtain money. The purpose, as the plan was, when they went to the home, was a home invasion for money and for a safe. After they figured out there was no money, then the option came of an ATM card to at least obtain money from that ATM card. It was there in that precise moment that perhaps, let's say the venture changed into what was charged here, into a carjacking, when was the decision for them to take the car out of the home, even though they had arrived in their own vehicle? No. I think I'm a little confused by your argument, but just to tie it back to your client Hernandez, what is specifically your contention regarding him? Well, Victor Hernandez, the only evidence presented at trial was that he was present during the robbery, and he was ransacking the house looking for money. There is no information that he participated in any discussion of taking any vehicles from the house. So the testament is they, I think Suarez says, they decided to take Luis downstairs, which is then when the car is taken. So why is that not sufficient for a jury to conclude that they included this crew of people who was ransacking the house, and then when they couldn't find money, the next step was let's get to the ATM, we'll bring him downstairs, which then led to the carjacking. Why couldn't a jury find that? Because Suarez, the way he expressed himself, he also said they were heating oil. And when asked specifically who was heating oil, he said Correadorno. He expressed himself as they, but when he was being asked specifics, he provided specific information. When the oil was being, that's just an example, Judge, when the oil was being heated in the frying pan to torture the people, seven defendants were not standing in front of the stove. So the way he expressed himself was that, but there was no specific information presented at trial that at the moment that they decided, let's take this car, my client was aware, he had knowledge, or he even participated in that. As a matter of fact, my client never, never exited the second floor towards the first floor. So he didn't find out about the carjacking probably until the end. But at the same time, the government did not provide that sort of information when we were at trial. So the they just isn't enough. I mean, the jury, your view is the jury can't sort of operationalize the they to mean all the people in the house. Judge, this is specific intent as to what the person was feeling in that moment. And you cannot generalize what seven people were thinking as to carjacking because carjacking is that. I mean, it was the government who decided to charge a carjacking, not a home burglary, not any Hobbs Act or any other crime. So as being a specific intent crime tied to that specific intent at the moment of the taking, I believe that the jury needed to individualize to each and every person. In the case of Victor Hernandez, there is no testimony and no evidence presented at trial that he was aware of the carjacking was going to take place or that even a discussion was going to be made. If you look into the transcripts for Mr. Wilmer Suarez, who is the co-operator in this case, who is the one who's talking about day, day, day. He said that at some moment they were going to take the vehicle from the house. But at no moment he says that there was a discussion made out of it. They took, I'm sorry, I have that here, Your Honor. Specifically, the words are, I'm sorry, taking your time. It's okay. We'll be able to read it. I mean, I understand. They wanted to put him in one of the vehicles, what he says. They wanted to put him in one of the vehicles. At no moment he says, so we had this discussion. Even though the brief for the government says that he was talking to his co-operators. Your point is, this is how Suarez talks, but you can't, because we know that, you can't just generalize that he meant everyone because that's just how he spoke. He used they all the time and it meant different things. Yes, Your Honor. I believe it was something perhaps in translation, but trial, I was a trial attorney. That was two years ago, so I don't quite remember those words. But I believe in translation. That's why you have the word they a thousand times on that transcript. I understand. Thank you. Thank you, Counselor. We'll attorney for Rivera-Rivera. Please introduce yourself on the record. Good morning, Your Honor. May it please the court. Jason Gonzalez on behalf of Mr. Anthony Rivera-Rivera. Your Honor, if I may, I'd just like to add to what further counselors have stated regarding the carjacking. is the fact that Mr. Anthony Rivera, when the carjacking, the alleged carjacking happened, he was upstairs. He did not see the taking of the vehicle. He did not see them put them in the car. And the aiding and abetting rule requires that he has prior knowledge to have the opportunity to take the moral, to make a moral decision to walk away. My client never had that opportunity because he never found out from the transcript. But the court can read that the only time that my client might have had an opportunity to see that the car had been taken, it was 10 minutes away from the house when allegedly Mr. Suarez was on his way back to see his co-defendants and they crossed paths in the road. And that's what I would like to add regarding the carjacking. I'd like to focus on the Brady violation that the government had in this case, Your Honor, precisely because disclosure of Brady evidence is a constitutional obligation. The prosecution must disclose it regardless of whether a defendant makes a specific request. Now, in this case, Your Honor, we have the problem that seven years after these individuals were arrested, the seven individuals, three days prior to trial, the government provides five Brady violations. And those Brady violations were they provided in late disclosure FBI fingerprint reports. But that's a distinction. You just made the distinction. A Brady violation is suppression. I'm not defending a seven-year delay. But nevertheless, it was disclosed prior to trial. And it would seem to me then the remedy is continuance. And you got a continuance. And I don't think in the record you said that continuance was insufficient for you to do whatever you needed to do based on the later evidence. So to refer to it as a Brady violation, I'm not sure is correct, not good discovery practice for sure. But I think why is, I guess my question is why is continuance not a sufficient remedy in these circumstances? There's no way we could have done anything, Your Honor. Seven years later, when we read the case law that Did you make a record of that somewhere, that it was impossible with unlimited time? I believe that the Brady motion that we had, I think it was an eight-hour hearing, we made these arguments, Your Honor. Seven years later, I have no opportunity to actually interview anybody who would remember what had happened that day. I don't remember what I had for lunch yesterday. Imagine going to the ward where this happened, trying to talk to the neighbors to see if they're the actual neighbors that were there seven years before. And if I ever find one, ask them about what happened on a specific day. There's no way that they could have done that. And the problem is that the government had exculpatory evidence. They had FBI fingerprint reports that exculpated Mr. Oppenheimer's client and my client. And these fingerprint reports had actual fingerprint analysis that referred to Codefendant Taco Bell, which is Mr. Correa and other of the codefendants. They had DNA forensic documents that put other codefendants at the house at the time that this happened. Given that you have, I understand your Brady arguments, and I appreciate them. Could we skip, because I think you have some other arguments, including I wanted to ask you something about your Confrontation Clause arguments? Yes, ma'am. When the government responded, they said they only viewed your Confrontation Clause claims as having two preserved claims, but they responded that those challenges were harmless beyond a reasonable doubt. The statements were that Luis Emilio saw the armed assailants grab Carmen and Antonio outside the house, and that the Confederates here refused Luis Emilio's request to give him something to tie up his wound. Why, in your view, aren't those harmless? Those statements, they're harmless in the sense that my client had nothing to do with that. That was Mr. Correa Adorno, who is actually the person who, in the testimony of Mr. Suarez, committed those crimes. My client, allegedly, was at that time in one of the rooms looking for money. That would be my answer to your question, unless the Court has another. I have a question on the severance. Yes, sir. It strikes me that your point is that there was a second statement that I think Rios made that said your client was not involved in the carjacking, and your point was, I think, you couldn't admit that because you couldn't have Rios while you were being tried with Rios. Tell me, what was your attempt? How were you going to get that in? How were you going to get that fact in if you were granted a severance? Because it seems to me that that's one of the government's arguments, that you never would have gotten that statement into a trial of district court. In this case, what happened was that Mr. Rios' video was presented as evidence against Mr. Rios, and the jury had an opportunity to see it. If I would have had the opportunity to have a severance in this case, I would have brought in Mr. Rios as a witness. And even if he declined to answer my questions and he plead the fifth, I would have asked him at least to identify the video, to authenticate this video, and I would have played the video in which this individual has exculpatory statements, including two other co-defendants who had video-recorded confessions where they both failed to mention Mr. Rivera and Mr. Melendez as part of the crew that were there that day. And it's not until Agent Guillermo Gonzalez, which was the case agent, continuously mentions my client and Mr. Oppenheimer's client's name that they even say, I don't know who they are. And Wilmette Suarez says, regarding Mr. Oppenheimer's client, is that I met him in jail at Bayamón 705. So I would have brought in that evidence in my case to prove that there was exculpatory evidence. I would have used that with the DNA forensic analysis and with the fingerprint analysis that have evidence of the other co-defendants, but not of my client. The government, I think, responds to that by saying that you didn't show that the denial of the motion to sever a compromise in a specific trial, right, because you needed to show that Rios would actually testify in your case. Yes, ma'am. How do you respond to that? I spoke with sister counsel Lidia Lizarriba at the trial, and we mentioned prior to the trial that we were going to subpoena him, and we were going to try to use him. I had no information. Maybe the better question I should have asked is, did you state any of that in the record? I didn't see any of that. Right now, I don't remember, Your Honor. I'm a little confused. Yes, ma'am. You're saying that you could not have introduced that video short of putting Mr. Rios on the stand? Yes, ma'am, because either I could have done it with Agent Guillermo Gonzalez, who was present at the interview, and who was the one who asked the questions. I could have... But why didn't you? Because it was... We had such a short time, Your Honor, to prepare for this. We had a completely different theory of defense. We had three weeks to literally change this defense. You asked for a further continuance. That's what I don't understand about this whole argument. I mean, did you ask and denied a further continuance to change your strategy based on new information? No, Your Honor, because we would not have an opportunity to find any new information because of what I stated before. You just said there was... Sorry. Yes, ma'am. But you're arguing that you couldn't put the agent on the stand to authenticate the tape. And I don't understand that. If the agent could have authenticated the tape, then you could have played the tape in the context of the joint file. But that was the tape that was suppressed by the court, Your Honor. There was two video recordings. And one of the video recordings in which the defendant, Mr. Jimmy Rios, actually admits... If it was suppressed, how was it going to come in at a separate trial? I could have had another shot or another opportunity to try to introduce it without having the court suppressing it prior to... It was suppressed against Mr. Rios. Yes, sir. Mr. Rios didn't want it to come in. You did. I think you're telling me the problem is if Rios doesn't want it and they're sitting there together, it can't come in because then the jury would see it. And I think you're saying, or should be saying, if I had a separate trial, that problem would go away and we wouldn't have raised any problem with it because it helped them. That would have been my argument, Your Honor. Thank you. Thank you, Your Honor. Thank you, counsel. Attorney for Appoli, please come up and introduce yourself on the record. Good morning, Your Honor. And may it please the court, Ricardo Humbert Fernandez for the United States. A rational jury could find... Can we start with the severance since we're on that? Sorry? Can we start with the severance problem? Of course, Your Honor. It's on my mind. It seems like it's a problem that there was an exculpatory statement that was for Mr. Rivera that was suppressed as to Mr. Rios, and therefore he couldn't use it at a joint trial, which seems to be what the complaint is or should be. And that does seem to be troubling. First off, Your Honor, the standard for the severance claim would be manifest abuse of discretion, and the district court can't have abuse of discretion because none of these representations were made to the district court when asking for a severance. Is there a video that's exculpatory to Mr. Rivera? I believe there is, but Mr. Rivera did not explain to the court how he would introduce it or that, more importantly, that Mr. Rios would, in fact, sit and testify. And Mr. Rivera has... It seems like a pretty straightforward idea. Even if he can't use... Let's say the video can't be used because it's hearsay. Let's just assume that. You can wait for Mr. Rios to be either convicted or acquitted. If he's convicted, he can be sentenced. His Fifth Amendment privilege goes away. He can be compelled to testify. That doesn't strike me as complicated. Well... Your Honor, the thing is, this court's precedent is that the Drugus analysis is what applies in these situations, and the district court followed the Drugus analysis to a T. But there's exculpatory information that this defendant could have used from a co-defendant that says, I am not... He is not there. I don't know him, basically. I understand this video. And there's no DNA and all the other things he said. That seems like a really good defense. And he couldn't use it because he's being tried with Rios. And I don't know if they said all the right things in the right order. But if we just think about that, that seems like not a fair situation. Because he couldn't present the story that is no fingerprints, no DNA. And one of the co-defendants says, I'm not even there. And he didn't get to do that. I think the important part of the analysis here is that he wouldn't have been able to do that either way. Even if the trial had been severed, there's nothing in the record that Mr. Rios would have testified. And, Your Honor, you mentioned that he could be compelled after sentencing. But he could still plead the Fifth. Not after he loses his Fifth Amendment privilege. He can't when he's sentenced, when his case is over. So at that point, you could have had the trial. He can be confronted. Either he says that's what I said, but obviously if he lies about that, he can be impeached. And it seems like you have a whole different trial potentially. And the judge just says, well, I think the government's persuasive with no real discussion. And we're supposed to say, well, abuse of discretion, good enough. But I'm worried that this guy didn't actually get a fair trial. Your Honor, it's a weighing of interests in all these situations. And I think that the way— And what's the harm to you to wait for Mr. Rios to be sentenced as far as the weighing of interests? This guy, I don't think he got a fair trial. And you just have to wait a little bit for Mr. Rios' case to play out. Again, Your Honor, I think my answer to your question would be that at bottom, this is an abuse of discretion issue. And all these arguments that the court is articulating now, Mr. Rivera did not articulate to the district court. So the district court can't have abuse of discretion when it denied a motion that without explanation, without detailing that Mr. Rivera would—that Mr. Rios would testify on Rivera's behalf or setting forth a procedure by which that could be made feasible, the district court can't have abuse of discretion by denying that motion. And there's case law to that effect in our brief. I'm sorry, Your Honor. Counsel says that they were so thrown off by the late-produced discovery that they were scrambling trying to alter their theories of defense. So what is the reason that the discovery was produced so late? Your Honor, my understanding of why discovery was produced late was that there was a lot of turnover in attorneys in this case. And by the time the attorneys that actually—the AUSAs that actually took this to trial were preparing in the run-up to trial, they found that they couldn't locate a bunch of the discovery letters, and they weren't sure what had been produced. So out of an abundance of caution, they went into a room that had all the discovery in the case, and they produced everything again. And it appears some reports had fallen through the cracks and some interviews. But the important part here is that it was produced, and the court continued trial, gave the defendants a month with those materials, about a month with those materials. And when trial commenced, none of the defendants and Mr. Rivera did not—didn't tell the court that the delay had impacted them in a way that they needed more time or that they had been unable to prepare for—prepare their defense. So yes, there was a delayed disclosure, but I don't think the record supports any finding at all that there was any prejudice stemming from it towards the—towards Mr. Rivera. And even more, in cases of delayed disclosure, Mr. Rivera—like this one, Mr. Rivera has to make a prima facie showing of a specific trial strategy that has been foreclosed, and he does not do that. He did not do that below, which is why the court denied his motion to dismiss, and he doesn't do that on appeal either. All he—he in broad strokes says that the delay prejudiced him, but the case law, the standard that applies to delayed disclosures requires more from a defendant in order to prevail. Can we switch topics? Yes, Your Honor. I was trying to think about case law that we have carjackings that deal with physically where the defendants are when the carjacking occurs. So I think we have some cases that say, you know, if the defendants are far away, not on site, the carjacking happens. If they ordered, well, they're not going to be on the hook for carjacking there. We know, you know, if you're effectuating the carjacking and getting in the car and taking people with you, well, that's a carjacking. Here, some of the defendants are, I think, upstairs in the house and away from where the car was. Are there cases you can direct us to that sort of deal with that maybe more gray area situation? Off the top of my head, Your Honor, Garcia Alvarez is one of those cases where I believe there's an apartment complex that a group of assailants gets into and they find a man in the parking garage. They beat him. They take him upstairs to his apartment, and then the car is stolen. And there's some geographic considerations there because I believe in that case at least one of the assailants is in the apartment, the others are in the parking garage, and others are outside. And I believe in that case at least Garcia Alvarez, if not all the other defendants, were convicted on an aiding and abetting theory that was affirmed by the court. So what's the evidence in this case that whether they're upstairs, that they know that Suarez and Guzman are taking the car and they're going to continue to do their job, which is to keep, I guess, the victims at bay? What's the evidence that they know? And maybe if I could just add to that. The specific evidence to the specific defendants because we have this issue that I think we'll probably talk a little bit more about, which is that a lot of the testimony here is they. Your Honor, I will grant that there is little reference to Rivera or Hernandez or Rios by the three witnesses to them specifically. The evidence deals with the assailants as a group, but there's more to that. And it isn't simply asking the court to read they and then read into that, that all the participants are involved. There are contextual clues in the testimony that tell the court that the witnesses are talking about the participants as a group. For example, Suarez says everybody was looking throughout the house, and since they couldn't find any money or anything, then they went ahead and started heating oil in a pan. He's clearly referring to them as a group because he just said everybody's looking through the house. It's tied to the everybody. Carmen also in her testimony, when you read it, it's clear that she's referring to the group. But there's, as I said, more than that. Number one, there's no evidence that points the other way. And there's Carmen's testimony that the group was highly organized, that they're working together, that they're performing in synchronicity. That all makes sense except for the following. This thing didn't go how they wanted it. They wanted there to be money in the house. There wasn't. And at some point, they're scrambling for plan B. So the organizational piece, to me, breaks down once they can't find anything. And it's like, what are we going to do now? Well, let's see if we can take somebody to an ATM. So how does that? Yes, Your Honor. But the thing is, when that breakdown happens, the record is clear that everybody is in the room. And we know that for three reasons, really, or three evidentiary materials. Suarez testifies, what I just read, that they're looking through the house. They can't find anything. And then they go into the room and they proceed the sequence. I'm sorry. Everybody's in the room. But what is the evidence that everybody thought that they were going to take the victim's car as opposed to drive to the ATM in the car that they showed up in? Because that's Suarez's testimony, Your Honor. Suarez says that they took Luis Emilio, and I have it directly here, but his direct phrase is, or his direct wording would be, he says, they took Luis Emilio because they wanted to put him in one of the cars from the house, one of their own cars. So it's clear that at that moment that's what's being thought of, or at least that's the evidence that was presented to the jury. And, Your Honor, we also know that they're all in that room discussing what to do because Carmen's testimony is that they're looking through the house. They can't find anything. They confront them with the checks and the revolvers. And then at one point she says, they give up. And they take all the other valuables they can locate through the house and they give up. And then the search of the house has concluded by that point. And that's the moment where she says, they said, what do we do now? Do we take the old lady? And then Luis Emilio interjects very courageously, no, take me. And that's the moment when they decide to take Luis Emilio from the second floor down to the first floor and the car. So it's clear from that evidence that the search of the house has concluded that the assertions by the defendants, that the defendants are, that Rivera Hernandez and Rios are somehow scattered throughout the house, can no longer be true because the search has concluded. And it is in that second floor when they take the Luis Emilio down to the first floor, that according to the evidence reading Suarez's testimony and Antonio's testimony as well, that the intent to commit a carjacking has already been established between the Confederates. Because they take him down to the first floor for that specific purpose. Do you say that testimony that establishes that is the testimony that they were all in that room? Yes, Your Honor, which is bolstered by the fact that they have to all be in that room because, number one, they're highly organized and the search of the house has concluded as the evidence established. So they're at this reading the evidence in context. They're at this meeting point on the second floor by this point. And that's when they decide to take Luis Emilio down to the first floor and carjack him. So in terms of going defendant by defendant here, we have Rios Alvarez is first. You have no specific evidence that has him individually. Well, we have that evidence that applies to the three. As in the case of Rios, there's also his confession or his admissions to law enforcement that were brought up twice, a trial by TFO Colon and by Agent Gonzalez, in which he says that he witnessed the Guzman and Suarez driving off in the carjacked frontier. And then he also says that he saw the victims being burned and stabbed. And in terms of Hernandez and Rivera, do you have anything individual? You said anything individual in the record regarding the knowledge of the carjacking? Again, Your Honor, it's that evidence that pertains to they. As to Rivera, there is a concession in the brief, and it's also borne out by the evidence that he says that he was guarding Carmen. He was guarding Doña Carmen. That's in his brief. I have the site in here, but to move on. If we even accept guarding is enough, he has to know he's guarding her because the car had been taken. Yes, Your Honor, but that's precisely my point. If he's guarding Doña Carmen and Doña Carmen is in the same room where they take Luis Emilio down to the first floor for the purpose of putting him in the car, then he knows that's going on. But he has to know it's the victim's car, and that all comes back to the same, what you told us is the agreement in the room when they are all there, that they're going to take the victim's car, not their own car. Yes, Your Honor, and also I think it's fairly obvious that they couldn't just take the defendant's own car because the evidence is that that was the single car that the defendants had at the property. So if the group is splitting up, they wouldn't just leave the others carless in the house. They could have just done the same thing and said you take the victim's car later. I mean that doesn't really – you can't really say that. That seems speculative. I would grant that, Your Honor, but then that would still put a carjacking on the books because either we do it now or we do it later. But if one group is taking off in one car and we're here stranded without a car, then that necessity becomes apparent at least. But I don't think the court needs to go that far. I think the evidence establishes that they knew, and certainly by the time that the other defendants are calling from the ATM machine to ask for the PIN number, the defendants in the house had to know by then as well. At least it's a fair inference. And furthermore, Your Honor, by the time they leave and they bind Doña Carmen before they go, they also must have known. Again, just to go back to the same thing, what they know is they left and are at an ATM. So they left in some vehicle likely and are at an ATM. But again, the only evidence that the vehicle is the victim's vehicle is the meeting in the room where they say that's what we're going to do. Yes? Yes, Your Honor. I think it's – And Carmen's testimony that they were organized well. Yes, Carmen's testimony that they were well organized. Can I – I know you're over your time, but I was confused in your brief. I'm moving to the abduction enhancement for Rivera. I think your brief says – it cites the two sort of factual scenarios, Luis Emilio going from the first to second floor and Carmen from the garden to the first floor. On what basis, factual basis, is it the government's position that the enhancement was applied? On Luis Emilio being taken to the car. Okay. It was the one that was talked about at sentencing. The government in its brief made an alternative argument that it believes that the taking of Carmen and Antonio from the garden outside the house up to the second floor of the house would also qualify as an abduction under the guidelines. Okay. Thank you, Your Honor. Thank you, counsel. Attorney Oppenheimer, you have a one-minute rebuttal. Good morning. Before I start, I would like to request the court permission for my minute of rebuttal for Mr. Gonzalez to use it instead of me. Would you allow that? Yes. Thank you. I please the court, Jason Gonzalez and Mr. Antonio Rivera. Your Honor, the problem with that is that the testimony of Wilmer Suarez is different from what the government is saying. When he was testifying about how things happened, he's the one who says that he's going to go out and get the ATM cards and take some money. At docket 652, page 69, line 18, when the government asked him who took the car, he responded, I'm the one who took the car. Then at page 18, line 12, they ask him, what was he going to do with this? And he says, we did not intend to cause any harm. All we wanted to do was steal money. That's the difference. He went down, he saw the car, he saw the opportunity, and he took it. Nobody upstairs had the opportunity to make the moral decision to walk away if they had that opportunity. Now, regarding the severance, we believe that Suarez's video mentions that Mr. Suarez, in his video confession, he never mentions Mr. Rivera or Mr. Hernandez until Guillermo Gonzalez is the one who insists that he was there. If we could have had the opportunity to present Mr. Rios' video confession, we would have had a better theory of defense to put before the jury. Thank you, Your Honor. Thank you. Thank you, counsel. That concludes arguments in this case.